Concurrence by Judge Owens; Partial Concurrence and Partial Dissent by Judge Tallman; Dissent by Judge Bea OPINION BERZON, Circuit Judge: The County of Alameda seeks to preserve the health and safety of its residents by (1) requiring firearm retailers to obtain a conditional use permit before selling firearms in the County and (2) prohibiting firearm sales near residentially zoned districts, schools and day-care centers, other firearm retailers, and liquor stores. The individual plaintiffs in this case, John Teix-eira, Steve Nobriga, and Gary Gamaza (collectively, “Teixeira”), wished-to open a gun shop but were denied, a conditional use permit because the proposed location of their gun shop fell within a prohibited zone. Teixeira challenges the Countys zoning ordinance, alleging that by restricting his ability to open a new, full-service gun store, the ordinance infringes on his Second Amendment rights, as well as those of his potential customers. Teixeira has not, however, plausibly alleged that the County’s ordinance impedes any resident of Alameda County who wishes'to purchase a firearm from doing so. Accordingly, he has failed to state a claim for relief based on infringement of the Second Amendment rights of his potential customers. And, we are convinced, Teixeira cannot state a Second Amendment claim based solely on the ordinance’s restriction on his ability to sell firearms. A textual and historical analysis of the Second Amendment demonstrates that the Constitution does riot confer a freestanding right on commercial proprietors to sell firearms. Alameda County’s zoning ordinance thus survives constitutional scrutiny. I. Background A.' In the fall of 2010, Teixeira, Nobriga, and Gamaza formed a partnership, Valley Guns and Ammo, with the intention of opening a gun store in Alameda County, California. After conducting local market research among gun enthusiasts, Teixeira concluded that there was a demand for a full service gun store in an unincorporated area of Alameda County called San Lorenzo, near the incorporated city of San Lean-dro. In .response to this demand, Teixeira intended to open a specialty shop that would sell new and used firearms and ammunition and would also provide gun repairs, gun smithing, appraisals, and training and certification in firearm safety. Teixeira 'contacted the Alameda County Planning Department for information as to any land use or other permits necessary to open a gun store in unincorporated areas of the County.[1] The Planning Department informed Teixeira that because he intended to sell firearms, he would need to obtain a Conditional Use Permit pursuant, to Alameda County Ordinance Sections 17.54.130 ei seq. Conditional Use Permits are required for certain land uses and are granted after a special review in which the County determines whether or not the proposed business (1) is required by public need; (2) is properly related to other land uses and transportation and service facilities in the area; (3) if permitted, will materially and adversely affect the health or safety of persons residing or working in the vicinity; and (4) will be contrary to the specific performance standards established for the area. Alameda Cty., Cal., Code § 17.54.130. The County informed Teixeira that’to receive a Conditional Usé Permit for his proposed gun store, he also had to comply with Alameda County Ordinance Section 17.54.131 (the “Zoning Ordinance”). That ordinance requires, among other things, that businesses selling firearms in unincorporated areas of the County be located at least five hundred feet away from any of the following: schools, day care centers, liquor stores or establishments serving liquor, other gun stores, and residentially zoned districts.[2] Based on this guidance, Teixeira identified a suitable rental property at 488 Le-welling Boulevard in unincorporated Alameda County.[3] Teixeira obtained a survey that showed, based on door-to-door measurements,[4] that the property was more than 500 feet from any disqualifying property under the Zoning. Ordinance. Teixeira began arranging with the landlord to lease the Lewelling Boulevard property and to make the modifications necessary to transform the space into a gun store compliant with all state and federal regulations. . Teixeira then applied to the Alameda County Community Development Agency for a Conditional Use Permit for his planned store. Staff of the Alameda County Community Development Agency Planning Department (“Planning Department”) prepared a report for the West County Board of Zoning Adjustments (“Zoning Board”) on Teixeira’s application. The staff report made the following findings: there was a public need for a licensed firearms dealer; the proposed use was compatible with other land uses and transportation in the area; and a gun shop at the proposed site would not adversely affect the health or safety of persons living and working in the vicinity. The staff report also found, however, that the site of the proposed gun shop did not satisfy the Zoning Ordinance’s distance requirements, because it was approximately 446 feet from two residential properties in different directions. The staff report’s distance calculation was based on measurement from the closest exterior wall of the proposed gun shop to the property lines of the disqualifying properties. The staff report thus recommended denying Teixeira’s permit application. ‘ The Zoning Board held a public hearing on Teixeira’s Conditional Use Permit application. Teixeira appeared at the hearing and offered testimony in support of his application; neighborhood residents also appeared, some testifying in support of the application and others in opposition. After the hearing, the Planning Department issued a revised staff report. That report acknowledged the ambiguity in the Zoning Ordinance regarding how the 500 feet should be measured for the purpose of determining compliance. The report nevertheless concluded that the proposed gun store location was less than 500 feet from the property line of the closest residentially zoned district, whether measured from the exterior wall, front door, or property line of the proposed gun shop.[5] The Planning Department staff therefore again recommended denying Teixeira a Conditional Use Permit and variance; Notwithstanding this recommendation, the Zoning Board passed a resolution granting Teixeira a variance from the Zoning Ordinance and approving his application for a Conditional Use Permit. The Zoning Board concluded that a gun shop at the proposed location would not be detrimental to the public welfare and warranted a variance in light of the physical buffer created by a major highway between the proposed site and the nearest residential district. The Zoning Board also determined that there was a public need for a licensed firearms, retailer in the neighborhood. Shortly after the County granted Teix-eira’s permit application, the San Lorenzo Village Homes Association filed an appeal challenging the Zoning Board’s resolution. Acting through three of its members, the Board of Supervisors voted to, sustain the appeal, overturning the Zoning Board’s decision and revoking the Conditional Use Permit. After the permit was revoked, Teixeira alleges, he was unable to identify any property in unincorporated Alameda County that satisfied the ordinance’s 500-foot rule and was otherwise suitable—in terms of location, accessibility, building security, and parking—for a gun shop. Teix-eira later commissioned a study to analyze the practical implications of the Zoning Ordinance for opening a gun store in unincorporated areas of the County. The study found it “virtually impossible to open a gun store in unincorporated Alameda County” that would comply with the 500-foot rule “due to the density of disqualifying properties.”[6] B. Joined by institutional plaintiffs The Calguns Foundation, Inc., Second Amendment Foundation, and California Association of Federal Firearms Licensees, Inc., Teixeira filed a complaint in federal district court challenging the Board of Supervisors’ decision to deny him a variance and Conditional Use Permit. The challenge was premised on due process, equal protection, and Second Amendment grounds, and alleged violations of Teixeira’s own rights as well as those of his prospective customers. Alameda County filed a motion to dismiss the complaint for failure to state a claim, which the district court granted, with leave to amend; Teixeira also filed a motion for a preliminary injunction, which the district court denied. The plaintiffs thereupon filed an amended complaint, which the district court likewise dismissed for failure to state a claim, this time without leave to amend. A three-judge panel of this court affirmed the district court’s dismissal of Teixeira’s Equal Protection Clause claims but reversed the district court’s dismissal of Teixeira’s Second Amendment Claims, remanding for further proceedings.[7] See Teixeira v. County of Alameda, 822 F.3d 1047 (9th Cir. 2016). Judge Silverman dissented from the Second Amendment holding. See id. at 1064 (Silverman, J., dissenting). II. A. The Second Amendment provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II. As interpreted in recent years by the Supreme Court, the Second Amendment protects “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” District of Columbia v. Heller, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); see also McDonald v. City of Chicago, 661 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (“[0]ur central holding in Heller [was] that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.”). After Heller, this court and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense. For example, we held in Jackson v. City and County of San Francisco, 746 F.3d 953, 968 (9th Cir. 2014), cert. denied, — U.S. —, 135 S.Ct. 2799, 192 L.Ed.2d 865 (2015), that a prohibition on the sale of certain types of ammunition burdened the core Second Amendment right and so was subject to heightened scrutiny. Jackson involved a challenge by handgun owners to a San Francisco ordinance that prohibited the sale of particularly lethal ammunition, including hollow-point ammunition, within the City and County of San Francisco. Id. at 958. We recognized in Jackson that, although the Second Amendment “does not explicitly protect ammunition ..., without bullets, the right to bear arms would be meaningless.” Id. at 967. Jackson thus held that “ ‘the right to possess firearms for protection implies a corresponding right’ to obtain the bullets necessary to use them.” Id. (quoting Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011)).[8] Similarly, in Ezell v. City of Chicago (“Ezell I”), the Seventh Circuit held that an ordinance banning firearm ranges within the city of Chicago was not categorically unprotected by the Second Amendment and so demanded constitutional scrutiny. 651 F.3d at 704-06. Ezell I held that the Chicago ordinance, coupled with a law requiring range training as a prerequisite to obtaining a firearm permit, encroached on “the right to maintain proficiency in firearms use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense.” Id. at 708. This core right to possess firearms, Ezell I explained, “wouldn’t mean much without the training and practice that make it effective.” Id. at 704. Ezell I relied on Heller, which quoted an 1868 treatise on constitutional law observing that “to bear arms implies something more than the mere keeping; it implies the learning to handle and use them.” Id. (quoting Heller, 554 U.S. at 617-18, 128 S.Ct. 2783). As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense “wouldn’t mean much” without the ability to acquire arms. Id.] see Jackson, 746 F.3d at 967. The Tennessee Supreme Court cogently observed in 1871, interpreting that state’s constitution, that “[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.” Andrews v. State, 50 Tenn. 165, 178 (1871); see also Ill. Ass’n of Firearms Retailers v. City of Chicago, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) (emphasis in original) C‘[T]he right to keep and bear arms for self-defense under the Second Amendment ... must also include the right to .acquire a firearm, although that acquisition right is far from absolute ....”). We need not define the precise scope of any such acquisition right under the Second' Amendment to resolve this case. Whatever the scope of that right, Teixeira has failed to state a claim that the ordinance impedes Alameda County residents from acquiring firearms. B. “[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.” Craig v. Boren, 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Teixeira, as the would-be operator of a gun store, thus has derivative standing to. assert the subsidiary right to acquire arms on behalf of his potential customers. See also Carey v. Population Servs., Int’l, 431 U.S. 678, 683, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); Ezell I, 651 F.3d at 693, 696 (supplier of firing-range facilities had standing' to challenge Chicago ordinance banning firing ranges on'behalf of potential customers), But Teixeira did not adequately allege in his complaint that Alameda County residents cannot purchase firearms within the County as a whole, or within the unincorporated areas of the County in particular. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege in the complaint “enough facts to state a claim to relief that is plausible on its face.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed,2d 868 (2009), We assume the factual allegations in Teixeira’s complaint to.be true. See id. But “[c]onclusory allegations and unreasonable inferences ... are insufficient to defeat a motion to dismiss.” Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007). The operative complaint does not meet this standard with regard to whether residents can purchase guns in the County— or in unincorporated areas of the County— if they choose to do so.[9] Teixeira alleges in general terms that the gün store- he plans to open is necessary to enable his potential customers to exercise their Second Amendment rights. The complaint also states that the zoning ordinance amounts to a complete ban on new gun stores in unincprporated Alameda County .because, according to -a study commissioned by Teixeira, “there are no parcels in the unincorporated areas of Alameda County which would be available for firearm retail sales.” Whatever the standard governing the Second Amendment protection accorded the acquisition of firearms,[10] these vague allegations cannot possibly state a claim for relief under the Second Amendment. The exhibits attached to and incorporated by reference into the complaint, which we may consider, see United States v.'Ritchie, 342 F.3d 903, 908 (9th Cir. 2003), demonstrate that Alameda County residents may freely purchase firearms within the County.[11] As of December 2011, there were ten gun stores in Alameda County.[12] Several of those stores are in the non-contiguous, unincorporated portions of the County. In fact, Alameda County residents can purchase guns approximately 600 feet away from the proposed site of Teixeira’s planned store, at a Big 5 Sporting Goods store. Ezell v. City of Chicago (“Ezell II”), 846 F.3d 888 (7th Cir. 2017), involved an entirely different situation with regard to the availability of a gun-related service to county residents. Chicago’s zoning regulations at issue in that case so “severely limit[ed] where shooting ranges may locate” that “no publicly accessible shooting range yet exist[ed] in Chicago.” Id. at 894. (emphasis added). As a result, the zoning regulations, “though not on their face an outright prohibition of gun ranges, nonetheless severely restrict the right of Chica-goans to train in firearm use at a range.” Id. No analogous Restriction on the ability of Alameda County residents to purchase firearms can be inferred from the complaint in this case, The closest Teixeira comes to stating a claim that his potential customers’ Second Amendment rights have been, or will be, infringed is his allegation that the ordinance places “a restriction on convenient access to a neighborhood gun store and the corollary burden of having to travel to other, more remote locations to exercise their rights to acquire firearms and ammunition in compliance with' the state and federal laws.” But potential gun buyers in Alameda County generally, and potential gun buyers in the unincorporated areas around San Lorenzo in particular,, do have access to a local gun'store just 600 feet from where Teixeira proposed to locate his store. And if the Big 5 Sporting Goods store does not. meet their- needs, they can visit any of the nine other gun stores in the County as a whole, including the three other gun stores in the unincorporated parts of the County.[13] In any event, gun buyers have no right to have a gun store in a particular location, at least as long as their access is not meaningfully constrained. See Second Amendment Arms v. City of Chicago, 135 F.Supp.3d 743, 754 (N.D. Ill. 2015) (“[A] slight diversion off the beaten path is no affront to ... Second Amendment rights.”); cf. Whole Woman’s Health v. Hellerstedt, — U.S. —, 136 S.Ct. 2292, 2313, 195 L.Ed.2d 665 (2016), as revised (June 27, 2016) (“[I]ncreased driving distances do not always constitute an ‘undue burden.’”); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004) (holding that a zoning ordinance that limited churches and synagogues to residential districts did not violate the Religious Land Use and Institutionalized Persons Act (RLUIPA) because “walking a few extra blocks” is not a substantial burden). We recognized a similar principle in Jackson. After recognizing that San Francisco’s ban on the sale of certain particularly lethal ammunition did regulate conduct within the scope of the Second Amendment, we held that the regulation burdened the core right only indirectly, in part because handgun owners in San Francisco could freely obtain the banned ammunition in other jurisdictions and keep it for use within city limits. Jackson, 746 F.3d at 968. As Jackson illustrates, the Second Amendment does not elevate convenience and preference over all other considerations.[14] Moreover, Teixeira does not make any allegations about how far his potential customers currently travel to purchase firearms, or how much the proposed store would shorten travel distances, if at all, or for whom. Nor does Teixeira make any argument as to what distance necessarily impairs Second Amendment rights.' In sum, based on the allegations in the complaint, Teixeira fails to state a plausible claim on behalf of his potential customers that the ordinance meaningfully inhibits residents from acquiring firearms within their jurisdiction.[15] As Judge Silver-man observed in his dissent from the panel opinion, “[cjonspicuously missing from this lawsuit is any honest-to-God resident of Alameda County complaining that he or she cannot lawfully buy a gun nearby.” Teixeira, 822 F.3d at 1064 (Silverman, J., dissenting). Similarly missing is any allegation by Teixeira that any “honest-to-God resident of Alameda County ... cannot lawfully buy a gun nearby.” Id. In short, because the allegations in the complaint, read in light of the attachments and judicially noticeable information about the population and geography of Alameda County, do not plausibly raise a claim of entitlement to relief, the district court properly dismissed at the pleadings stage Teixeira’s claim that the ordinance infringes the Second Amendment rights of his potential customers. See Twombly, 550 U.S. at 556-58, 127 S.Ct. 1955. C. Teixeira also fails to state a claim for relief insofar as he alleges that the ordinance interferes with the provision of ancillary training and certification services in Alameda County. Teixeira maintains that existing firearm retail establishments in Alameda County do not meet “customer needs and demands” with respect to personalized training and instruction in firearms safety and operation, services Teix-eira planned to provide. The claim that the ordinance burdens his potential customers’ Second Amendment rights to obtain necessary firearms instruction and training is belied by the ordinance itself. The Zoning Ordinance limits the location of premises conducting “firearm sales.” Alameda Cty., Cal., Code § 17.54.131. It does not concern businesses providing firearms instruction and training services. Accordingly, the Zoning Ordinance would pose no obstacle if Teixeira wanted to open a business at the proposed site on Lewelling Boulevard to proride firearms instruction and training. This case is therefore entirely unlike the Ezell cases. The ordinance in Ezell I expressly banned publicly accessible firing ranges in the entire city of Chicago. 651 F.3d at 691. The zoning ordinance in Ezell II, although not an outright ban, so severely limited the potential locations for operating a range that less than three percent of the city’s total acreage was even theoretically available to site a range, and no range yet existed in the city. 846 F.3d at 894. The ordinances in those- cases thus directly, and meaningfully, interfered with the ability of city residents to maintain firearms proficiency, a right the Seventh Circuit found to be an “important corollary” to the core right to bear arms. Ezell I, 651 F.3d at 708. No such interference can be shown in this case, as the ordinance restricts the location of firearm sales,. not training. Teixeira thus fails to state a. Second Amendment claim related to' the provision of ancillary firearms training and certification services. D... Teixeira also suggests that, independent of the rights of his potential customers, the Second Amendment grants him a right to sell firearms. In other words, his contention is that even if there were a gun store on every square block in unincorporated Alameda County and therefore prospective gun ' purchasers could buy guns with exceeding ease, he would still have a right to establish his own gun store somewhere in the jurisdiction. He alleges that the Zoning Ordinance infringes on that right by making it virtually impossible to open a new gun store in unincorporated Alameda County.[16] We apply a two-step inquiry to examine Teixeira’s claim. See Chovan, 735 F.3d at 1136. We first ask “whether the challenged'law burdens conduct protected by the Second Amendment,” , and, if so, we then determine the “appropriate level of scrutiny.” Id. If we conclude that the ordinance imposes no “burden on conduct falling within the scope of the Second Amendment’s guarantee ... our inquiry is complete,” United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010), as a law that “burdens conduct that falls outside the Second Amendment’s scope, ... passes constitutional muster.” Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 195 (5th Cir. 2012). See also Peruta v. Cty. of San Diego, 824 F.3d 919, 939 (9th Cir. 2016) (en banc), cert. denied sub nom. Peruta v. California, — U.S. —, 137 S.Ct. 1995, 198 L.Ed.2d 746 (2017) (“Because the Second Amendment does not protect in any degree the right to carry concealed firearms in public, any prohibition or restriction a state may choose to impose on concealed carry ... is necessarily allowed by the Amendment.”). At the first step of the inquiry, “determining the scope of the Second Amendment’s protections requires a textual and historical analysis of the amendment.” Chovan, 735 F.3d at 1133; see also Ezell I, 651 F.3d at 701. Based on such an analysis, we conclude that the Second Amendment does not confer a freestanding right, wholly detached from any customer’s ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms. Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense, but the right of gun users to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them. The Supreme Court in Heller was careful so to caution, even while striking down a statute banning handgun possession in the home: “[N]othing in our opinion should be taken to. cast doubt on ... laws imposing conditions and qualifications on the commercial sale of arms.” 554 U.S. at 626-27, 128 S.Ct. 2783. These types of regulations, Heller explained, are examples of “presumptively lawful regulatory measures.” Id. at 627 n.26, 128 S.Ct. 2783. Two years later, the Supreme Court repeated that Heller “did -not cast doubt on such longstanding regulatory measures.” McDonald, 561 U.S. at 786, 130 S.Ct. 3020. The Supreme Court’s assurance in this regard guided our analysis in Nordyke v. King, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc), in which we upheld an Alameda County ordinance that regulated the manner of displaying firearms at gun shows on County property. Heller’s assurance that laws imposing conditions and qualifications on the commercial sale of firearms are presumptively lawful makes us ‘skeptical of Teixeira’s claim that retail establishments can assert an independent, freestanding right to sell firearms under the Second Amendment. The language in Heller regarding the reg-uMion of “the commercial sale of arms,” however, is sufficiently opaque with regard to that issue that, rather than relying on it alone to dispose of Teixeira’s claim, we conduct a full textual and historical review. i. Text We begin with text of the Second Amendment. See Heller, 554 U.S. at 576, 128 S.Ct. 2783. Nothing in the specific language of the Amendment suggests that sellers fall within the scope of its protection. After its introductory language,[17] the Second Amendment commands that “the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II. That, language confers a right on the “people” who would keep and' use- arms, not those desiring to sell them. The operative language—“keep” and “bear”—confirms that focus. As Heller observed, “the most natural reading of ‘keep Arms’ ... is to ‘have weapons.’ ” Heller, 554 U.S. at 582, 128 S.Ct. 2783. And “bear arms” is naturally read to mean “wear, bear, or carry ,.. upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in case of conflict with another person.” Id. at 584, 128 S.Ct. 2783 (omissions in original) (quoting Muscarello v. United States, 524 U.S. 125, 143, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (Ginsburg, J., dissenting)). Nothing in the text of the Amendment, as interpreted authoritatively in Heller, suggests the Second Amendment confers an independent right to sell or trade weapons. Second- Amendment analogues in state constitutions adopted during the founding period likewise expressly refer to the right of. the people to .bear arms, nowhere suggesting in their text that the constitutional protection extends to those who would engage in firearms commerce. See, e.g., Pa. Declaration of Rights, § XIII (1776) (“That the people have a right to bear arms for the defence of themselves and the state .... ”); Mass. Const,, Pt. First, art. XVII (1780) (“The people have a right to keep and to bear arms for the common defence.”); Ky. Const., art. XII, § 23 (1792) (“That the right of the citizens to bear arms in defence of themselves and the State shall not. be questioned.”); Ohio Const., art. VIII, § 20 (1802) (“That the people have a .right to bear arms for the defence of themselves and the State ....”). ii. The Right to Bear Arms in Britain and Colonial America The historical record confirms that the right to sell firearms was not within the “historical-understanding "of the scope of the [Second Amendment] right.” Jackson, 746 F.3d at 959 (alteration in original) (quoting Heller, 554 U.S. at 625, 128 S.Ct. 2783). The Supreme Court held in Heller that the Second Amendment “codified a pre-existing right,” 554 U.S. at 592, 128 S.Ct. 2783 (emphasis omitted), a “right inherited from our English ancestors,” id. at 599, 128 S.Ct. 2783 (internal quotation marks omitted). Heller and later cases scrutinizing firearms restrictions thus examined the nature of the right to bear arms in England, colonial America, and during the Founding. See id. at 584-610, 128 S.Ct. 2783; McDonald, 561 U.S. at 768-78, 130 S.Ct. 3020; Peruta, 824 F.3d at 929-39. Heller, McDonald, Pemta, and other eases provide thorough historical accounts, so we do not repeat that full history of the Second Amendment here. ■ Instead, we highlight the historical evidence that demonstrates that the right codified in the Second Amendment did not encompass a freestanding right to engage in firearms commerce divorced from the citizenry’s ability to obtain and use guns. We begin with a provision of the 1689 English Bill of Rights “long ... understood to be the predecessor to our Second Amendment.” Heller, 554 U.S. at 593, 128 S.Ct. 2783. With respect to the right to bear arms, the English Bill of Rights provided “[t]hat the subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law.” 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. This right to “have arms for their [djefence” was codified in reaction to the Stuart kings’ systemic disarming of the 'English people in the period leading up to the Glorious Revolution. See Heller, 554 U.S. at 592-93, 128 S.Ct. 2783. William Blackstone, “whose works ... constituted the preeminent authority on English law for the founding generation,” Heller, 554 U.S. at 593-94, 128 S.Ct. 2783 (internal quotation marks and citations omitted), described the right announced in that declaration as an “auxilli-ary right” designed to protect the primary rights of “free enjoyment of personal security, of personal liberty, and of private property.” 1 William Blackstone, Commentaries on the Laws of England 139-40 (1765). Should these primary rights be violated or attacked, Blackstone explained, “the subjects of England are entitled, in the first place, to the regular administration and free course of justice in the courts of law; next to the right of petitioning the king and parliament for redress of grievances; and lastly to the right of having and using arms for self-preservation and defence.” Id. at 140. St. George Tucker, in the “most important early American edition of Blackstone’s Commentaries,” Heller, 554 U.S. at 594, 128 S.Ct. 2783, similarly described the English right to bear arms as a necessary means of protecting personal liberties. The English Bill of Rights, Tucker observed, granted Englishmen “the right of repelling force by force; because that may be absolutely necessary for self-preservation, and the intervention of the society on his behalf, may be too late to prevent an injury.” 1 William Blackstone & St. George Tucker, Blackstone’s Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States, and of the Commonwealth of Virginia 145 (St. George Tucker ed., 1803). Blackstone’s and Tucker’s commentaries indicate that both recognized the right to bear arms in England to have been held by individual British subjects as a means to provide for the preservation -of personal liberties. Neither of these authoritative historic accounts states or implies that the English Bill of Rights encompassed an independent right to engage in firearms commerce. As many historians and courts have observed, the right to bear arms remained important in colonial America. “By the time of the founding, the right to have arms had become fundamental for English subjects.” Heller, 554 U.S. at 593,128 S.Ct. 2783. Arms were considered an important means of protecting vulnerable colonial settlements, especially from Indian tribes resisting colonial conquest, and from foreign forces. See Saul Cornell, The Early American Origins of the Modem Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History, 17 Stan. L. & Pol’y Rev. 571, 579 (2006); Joyce Lee Malcolm, To Keep and Bear Arms 139 (1994) (“Like the English militia, the colonial militia played a primarily defencive role .... The dangers all the colonies faced ... were so great that not only militia members but all householders were ordered to be armed.”). At the same time, colonial governments substantially controlled the firearms trade. The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers. See Solomon K. Smith, Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America, 49th Parallel, Vol. 34, at 6-8, 18-19 (2014). As scholars have noted, in light of the dangers the colonies faced, “[t]he emphasis of the colonial governments was on ensuring that the populace was well armed, not on restricting individual stocks of weapons.” Malcolm, supra, at 140. Historian Saul Cornell has observed that “[i]t would be impossible to overstate the militia’s centrality to the lives of American colonists. For Americans living on the edge of the British Empire, in an age without police forces, the militia was essential for the preservation of public order and also protected Americans against external threats.” Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 13 (2006). Governmental involvement in the provision, storage, and sale of arms and gunpowder is consistent with the purpose of maintaining an armed militia capable of defending the colonies. That purpose was later expressly recognized in the prefatory clause to the Second Amendment. Notably, colonial government regulation included some restrictions on the commercial sale of firearms. In response to the threat posed by Indian tribes, the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians. See Acts of Assembly, Mar. 1657-8, in 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 441 (1823); 1 J. Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May, 1665, at 49,182 (1850); Assembly Proceedings, February-March 1638/9, in Proceedings and Acts of the General Assembly of Maryland, January 1637/8— September 166k, at 103 (William Hand Browne, ed., 1883); Records of the Governor and Company of the Massachusetts Bay in New England 196 (Nathaniel B. Shurtleff, ed., 1853). At least two colonies also controlled more generally where colonial settlers could transport or sell guns. Connecticut banned the sale of firearms by its residents outside the colony. 1 Trumbull, Public Records of the Colpny of Connecticut, 138-39, 145-46. And under Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians. Acts of Assembly, Mar. 1675-76, 2 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 336-37 (1823).[18] As Heller observed, during the 1760s and 1770s, in the face of growing rebellion, the British Crown sought to disarm the colonies. 554 U.S. at 594, 128 S.Ct. 2783;’. see 5 Acts of the Privy Council of England §■■305, at 401 (1774) (James Munro ed., 1912). Colonial Americans reacted to the embargo by gathering arms for their defense. The General Committee of South Carolina, for example, adopted a resolution in 1774 recommending that all persons immediately supply themselves with powder and bullets, observing that “by the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them.” 1 John Drayton, Memoirs of the American Revolution from its Commencement to the Year 1776, Inclusive; as Relating to the State ■ of South-Carolina: and Occasionally Referring to the States of North-Carolina and Georgia 166 (1821) (internal quotation marks omitted). The panel majority suggested ■ that the Founders adopted the Second Amendihent in part because of the experience of the British arms embargo. See Teixeira, 822 F.3d at 1054-55. We agree that' “[o]ur forefathers recognized that the prohibition of commerce in firearms worked to undermine the right to keep and to bear arms:” Id. at 1054; But the panel’s conclusion that the Second Amendment therefore independently protects the sale of firearms does not follow. The British embargo and the colonists’ reaction to it suggest only that the Founders were aware of the need to preserve citizen access to firearms in light of the risk that a strong government would use its power to disarm the people. Like the British right to bear arms, the right declared in the Second Amendment of the U.S. Constitution was thus “meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of regaining rights when temporarily overturned by usurpation.” Thomas M. Cooley, The General Principles of Constitutional Law ‘in the United States of America 298 (3d ed. 1898). Early American legislators and commentators understood the Second Amendment and its state predecessors as protecting Americans against tyranny and oppression. They recognized that the availability of arms was a necessary prerequisite to exercising the right to bear arms, as the British arms embargo had made clear. Yet no contemporary commentary suggests that the right codified in the Second Amendment independently created a commercial entitlement to sell guns if the right of the people to obtain and bear arms was not compromised. These historical materials demonstrate that the,right to.bear arms, under both earlier English law and American law-at the time the Second Amendment was adopted, was understood to confer a right upon individuals to have and use weapons for the purpose of self-protection, at least in the home.[19] The colonies regulated, the sale of weapons to some degree. In short, no historical authority suggests that the Second Amendment protects an individual’s right to sell a firearm unconnected to the rights of citizens' to “keep and bear” arms.[20] We emphasize that in many circumstances, there will be no need to disentangle an asserted right of -retailers to sell firearms from the rights of potential firearm buyers and owners to acquire them, as the Second Amendment rights of potential customers and the interests of retailers seeking to sell to them will be aligned. As we have noted,. firearms commerce plays an essential role today in the realization of the individual right to possess firearms recognized in Heller. But restrictions on a commercial actor’s ability to enter the firearms market may also, as here, have little or no impact on the ability of individuals to exercise their Second Amendment right to keep and bear arms. Teixeira alleges that Alameda County’s zoning ordinance effectively bars him from opening a new gun store in an unincorporated area of the County. But he does not—and, given the number of gun stores in the County as a whole and in the unincorporated areas, as well as the geography of the County and the distribution of people within it, likely cannot[21]—allege that residents are meaningfully restricted in their ability to acquire firearms. Our conclusion that the Second Amendment does not confer a freestanding right to sell firearms is fully, consistent with Heller, which closely examined the historical record and concluded that, at its core, the Second Amendment protects “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” 554 U.S. at 635, 128 S.Ct. 2783. Later cases have also examined firearms restrictions with respect to the burden on a potential gun owner or user, even when the challenge is brought by a commercial actor engaged in supplying arms or related services. In Ezell II, for example, the Seventh Circuit held that Chicago’s restrictions on shooting range locations caused a Second Amendment injury because it “severely limit[ed] Chicagoans’ Second. Amendment right to maintain proficiency in firearm use via target practice at a range,” not because a range operator has any protected interest in operating a shooting range in the city. 846 F.3d at 890. Similarly, in a suit brought by firearms dealers and residents challenging a Chicago ordinance that banned “virtually all sales and transfers of firearms inside the City’s limits,” the District Court for the Northern District of Illinois examined the burden imposed by the sales prohibition on “law-abiding residents who want to exercise their Second Amendment right,” not on firearms dealers. Ill. Ass’n of Firearms Retailers, 961 F.Supp.2d at 940, 942; see also Nat’l Rifle Ass’n, 700 F.3d at 199-204 (examining whether a ban on firearms sales to minors burdened conduct protected by the Second Amendment by examining the burden on minors’ rights to acquire firearms, not the burden on sellers). Our holding does not conflict with United States v. Marzzarella. Marzzarella cautioned that if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, “it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms.” 614 F.3d at 92 n.8. Marzza-rella, rightly observed that in contemporary society, permitting an overall ban on gun sales “would be untenable under Heller,” id., because a total prohibition would severely limit the ability of citizens to acquire firearms. Marzzarella did not consider a situation in which the right of citizens to acquire and keep arms was not significantly impaired, yet commercial retailers were claiming an independent right to engage in sales. Finally, Teixeira invokes an analogy to First Amendment jurisprudence for his contention that the Second Amendment independently protects commercial sellers of firearms, suggesting that gun stores are in the same position as bookstores, print shops, and newspapers. The analogy fails. If Teixeira were a bookseller aiming to open up shop in Alameda County, the fact that there were already ten other booksellers indeed would not matter. But he is a gun seller, and for reasons explained below, that changes the constitutional calculus. First, the language of the Second Amendment is specific as to whose rights are protected and what those rights are, while the First Amendment is not. Compared to the Second Amendment’s declaration, after an announcement of its purpose in the introductory clause, that a right of “the people” to “keep and bear Arms, shall not be infringed,” the First Amendment’s command that “Congress shall make no law ... abridging the freedom of speech, or of the press” is far more abstract. And, whereas the Second Amendment identifies “the people” as the holder of the right that it guarantees, the First Amendment does not state who enjoys the “freedom of speech,” nor does it otherwise specify or narrow the right. Second, the Supreme Court has long recognized that speech necessarily entails communication with other people—with listeners. See Talley v. California, 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (“[Sjuch [a] ... requirement would tend to restrict freedom to distribute information and thereby freedom of expression.”); Hill v. Colorado, 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (“The right to free speech, of course, includes the right to attempt to persuade others to change their views .... ”). Merely protecting one’s right to speak without more—to lecture in vacant auditoriums or in remote forests, or to write pamphlets without being permitted to hand them out—would assuredly not satisfy the First Amendment. Selling, publishing, and distributing books and other written materials is therefore itself expressive activity. Sellers, publishers, and distributors of such materials consequently have freestanding rights under the First Amendment to communicate with others through such protected activity. The Supreme Court so observed in Smith v. California, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), stating that “the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of the[] constitutionally protected freedoms [of speech and of the press].” The right to express one’s views, orally and in writing, that is protected by the First Amendment thus necessarily entails reaching an audience, including through the distribution of written material. See id. “Liberty of circulating is as essential to th[e] freedom [of the press] as liberty of publishing .... ” Lovell v. City of Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (quoting Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1877)). The circulation and distribution of expression, in turn, often necessitates retail transactions by booksellers and other merchants, as free speech often isn’t free in the monetary sense. As, the Supreme Court has noted, .“virtually every means of communicating ideas in today’s mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs.” Buckley v. Valeo, 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In light of this commercial reality, the fact that “the dissemination [of books and other forms of the printed ’word] takes place under commercial auspices” does not remove those forms of communication from First Amendment protection. Smith, 361 U.S. at 150, 80 S.Ct. 215. In short, bookstores and similar retailers who sell and distribute various media, unlike gun sellers, are themselves engaged in conduct directly protected by the First Amendment. They . are communicating ideas, thoughts, and other forms of expression to those willing to hear or read them. Unlike gun sellers, they are “not in the position of mere proxies arguing another’s constitutional rights.” Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 64 n.6, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). So, for example,. if Teixeira wanted to sell books and magazines rather than ammunition and magazines, the existence of ten other bookshops in Alameda County— or on a single street in Alameda County— that could sell his potential customers the same material would be irrelevant to his claimed right to distribute and sell books. The First Amendment • grants him the right to speak and disseminate ideas, not merely his customers the right to hear them.[22] But Teixeira sells guns instead of books, and the act of selling firearms is not part or parcel of the right to “keep and beat arms.” Yet Teixeira is asserting the right to sell.guns no matter how many other gun stores there are in the jurisdiction. Here, the gun sellers are instead in an analogous position to medical providers in the Fourteenth Amendment context. When medical providers have challenged laws restricting the distribution of contraceptives and provision of -abortions, courts consistently examine whether the challenged laws burden their-patients’’ right to access reproductive health services, not whether the laws burden any putative right of the provider. See Whole Woman’s Health, 136 S.Ct. at 2312-13, 2316 (in suit brought’ by abortion providers, examining whether admitting privileges and surgical center requirements imposed on health providers burdened a woman’s choice to obtain a pre-viability abortion); Carey, 431 U.S. at 684-89, 97 S.Ct. 2010 (striking down a statute forbidding the distribution of certain contraceptives because the statute constrained a woman’s choice of whether to have a child); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 846, 886-87, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (examining regulations on abortions with regard to the burden imposed on women seeking -abortions).[23] Never has it been suggested, for example, that if there were no burden on a woman’s right to obtain an abortion, medical providers could nonetheless assert an independent right to provide the service for pay. As we have demonstrated, the Second Amendment does not independently protect a proprietor’s right to sell firearms,[24] Alameda County’s Zoning Ordinance, to the extent it simply limits a proprietor’s ability to open a new gun store, therefore does not burden conduct falling within the Amendment’s scope and is “necessarily allowed by the Amendment.” Peruta, 824 F.3d at 939; see also Marzzarella, 614 F.3d at 89. AFFIRMED. . Regulations enacted by California counties are effective only in unincorporated areas,.as city governments exercise regulatory authority within city boundaries. See Cal. Const, art. XI, § 7- ("A county or city-may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.”); City of S. San Francisco v. Berry, 120 Cal. App. 2d 252, 253, 260 P.2d 1045 (Cal. Dist. Ct. App. 1953) (explaining that when unincorporated land is annexed by a city it leaves "the territorial jurisdiction of the county” and thus ”cease[s] to be within [the county's] limits”) (internal quotation marks omitted). . The ordinance provides in relevant part that "no conditional use permit for firearms sales shall issue unless the following additional findings are made by the board of zoning adjustments based on sufficient evidence... (B) That the subject premises is not within five hundred (500) feet of any of the following;- Residentially zoned district; elementary, middle or high school; pre-school or day care center; other firearms sales business; or liquor stores or establishments in which liquor is served ;... ” Alameda Cty., Cal., Co.de § 17.54.131. The ordinance additionally requires that: (1) the proposed district is appropriate for firearm sales activity, (2) the applicant possess all firearms dealer licenses required by federal and state law, (3) the applicant obtain a firearms dealer license from Alameda County before commencing sales, (4) the premises fully comply with applicable building, fire, and other technical codes, and (5) the applicant has provided sufficient detail regarding intended compliance with California penal code requirements for safe storage of firearms , and ammunition at the premises. Id. . The parties and record variously locate 488 Lewelling Boulevard in San Lorenzo (an unincorporated area of the County), Ashland (another unincorporated area of the County), and San Leandro (an incorporated city in the County). The parties are agreed, however, that the .property; is located somewhere in unincorporated Alameda County. . Teixeira maintains that thé County informed him that, for purposes of compliance with the 500-foot rule, measurements should be taken from the closest door of the intended store to the front door of any disqualifying property. . The County rejected Teixeira's suggestion that .the distance should be measured from the. proposed site to the closest door of a dwelling in the residentially zoned district, rather than to the closest property line of a residential district. The ordinance states that the property proposed for firearm sales shall not be within five hundred feet of a "[r]esi-dentially zoned district,” 'foreclosing Teix-eira’s proposal that the measurement should be taken from the door of an actual dwelling. See Alameda Cty., Cal., Code § 17.54.131. . As of 2009, the total population of unincorporated areas of Alameda County was 142,-166, approximately 9% of the total County population of 1,556,657. See Alameda County Community Development Agency, 2009 Population and Housing Estimates for Alameda County and its Cities, Pub. No. 09-10 (May 2009), http://www.co.alameda.ca.us/about/ documents/AlaCtyPopHsng2009.pdf. We take judicial notice of these undisputed facts regarding the County’s population. See Fed. R, Evid. 201(b); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (holding that a court may take judicial notice of "matters of public record” that are not subject to reasonable dispute) (internal quotation marks omitted). The unincorporated areas of Alameda County are non-contiguous. Teixeira's proposed gun store—at 488 Lewelling Boulevard—would lie in an unincorporated sliver of land between the incorporated cities of Hayward and San Leandro. . Teixeira did not seek rehearing of the panel’s rejection of his Equal Protection claims. We affirm the district court on that claim for the reasons given in the panel opinion. . Jackson went on to hold that the prohibition on the sale of hollow-point ammunition "burdened] the core right of keeping firearms for self-defense only indirectly” and insubstantially, because San Francisco citizens were not precluded from using hollow-point ammunition in San Francisco if obtained elsewhere, and because the ordinance applied only to certain types of ammunition. 746 F.3d at 968. Applying intermediate scrutiny, Jackson then held the ordinance did not violate the Second Amendment, as the regulation of lethal ammunition was justified by the legitimate and compelling government interest in reducing the fatality of shootings. Id. at 970. Jackson also involved a challenge to a San Francisco ordinance that required that handguns be stored in locked containers or disabled with trigger locks when not carried on the person. Jackson, 746 F.3d at 958. Jackson upheld that ordinance, holding (1) that the ordinance regulated conduct falling within the scope of the Second Amendment, (2) but did not place a substantial burden on core Second Amendment conduct and therefore triggered only intermediate scrutiny, and (3) applying intermediate scrutiny, the ordinance passed constitutional muster. Id. at 963-66. . .We note that Jackson suggests that the proper inquiry regarding accessibility may not be limited to ,a particular jurisdiction. Jackson held that although San Francisco’s prohibition on the sale of hollow-point ammunition burdens core Second Amendment rights, it does so only indirectly, because a local resident' "is not precluded from using the hollow-point' bullets in her home if she purchases such ammunition outside of San Francisco’s jurisdiction.” 746 F.3d at 068. .“In Heller, the Supreme Court did not specify what level of scrutiny courts must apply to a statute challenged under the Second Amendment,” although the Court did “indicate that rational basis review is hot appropriate.” United States v. Chovan, 735 F.3d 1127, 1137 (9th Cir. 2013), cert. denied, — U.S. —, 135 S.Ct. 187, 190 L.Ed.2d 146 (2014) (citing Heller, 554 U.S. at 628 n.27, 128 S.Ct. 2783), In this Circuit, we have likewise not identified a uniform standard of scrutiny that applies to regulations that burden the Second Amendment, either generally or as to particular categories of regulations. We have instead held that "the level of scrutiny should depend on (1) ‘how close the law comes to the core of the Second Amendment right’ and (2) ‘the severity of the law’s burden on the right,’ ” Id. at 1138 (quoting Ezell I, 651 F.3d at 703); see also Jackson, 746 F.3d at 960-61. . Throughout this opinion, when we refer to the complaint, we include the supporting attachments. , As discussed, supra note 6, the unincorporated areas of Alameda County are nonconti-guous, and the site Teixeira selected.for his gun shop lies in a small unincorporated area adjacent to incorporated population centers. The site is relatively distant from the less urban, less populated parts ■ of the County. . The complaint also alleges that current firearms retailers in the area do not “meet customer needs and demands” and do not provide "the level of personal service” that Teixeira’s proposed store would provide. No case supports Teixeira's suggestion that the Second Amendment not only encompasses a right to acquire firearms but guarantees a certain type of retail experience. In addition, counsel for Teixeira stated at oral argument that Big 5 Sporting Goods does not sell handguns. That allegation is not in the complaint. Moreover, counsel for Teix-eira did not contend that handguns are not available for purchase at other stores in Alameda County. . Judge Bea’s dissent argues, post at 52, that we misread Chovan by declining to apply constitutional scrutiny to the Ordinance unless it "meaningfully” burdens the Second Amendment rights of would-be gun buyers. Not so. There is no meaningful difference—that is, one that matters—between failing to plead that "the ordinance meaningfully inhibits residents from acquiring firearms within their jurisdiction,” infra, and failing to plead that the ordinance actually or really burdens these residents' Second Amendment rights. .Teixeira waived his right to amend the complaint. When the district court asked whether he would like an opportunity to amend the pleadings, counsel for Teixeira declined, noting "we have pled the sufficient facts.” Moreover, the attachments to the complaint demonstrate that individuals in unincorporated Alameda County can purchase guns from several retail outlets, so any allegation that the ordinance poses a meaningful obstacle to acquiring firearms would be implausible. . The complaint does not address whether Teixeira could open a gun store in an incorporated area, in the vicinity .of the proposed site, nor does it allege that Teixeira has any particular reason for wishing to locate a store in the unincorporated areas of the County (such as proximity to the residence of the .owners). Although a number of Alameda County municipalities regulate the location of firearms sales,' see, e.g., Oakland, Cal.,' Mun, Code § 5.26.070(1), the complaint provides no information as to whether there are viable locations in those municipalities or any others in the County in which a new gun store could be located. Notably, 91% of the County's residents live in incorporated areas, see supra note 6, We need not determine, however, whether the complaint plausibly alleges meaningful interference with Teixeira’s sale of firearms, as we conclude that the Second Amendment does not independently protect the ability to engage in gun sales. . The introductory clause of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State ....” U.S. Const, amend. II. Heller held that this clause “announces the purpose for which the right was codified: to prevent elimination of the militia.” 554 U.S. at 599, 128 S.Ct. 2783. That purpose reflected the widely held belief at the time the Amendment was adopted that a “citizen militia ... might be necessary to oppose an oppressive military force if the constitutional order broke down.” Id. . Virginia law also provided that all persons were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony.” Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 Hening, supra at 403. The liberty to sell arms to-Virginians did not, however, extend to sales to others, and so did hot encompass a freestanding right to sell arms, independent of citizens' right to'acqiiire them. . We have not decided the degree to which the Second Amendment protects the right to bear arms outside the home. See Peruta, 824 F.3d at 939 ("There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public. The Supreme Court has not answered that question,- and we do not answer it here.”). . The panel majority relied on a 1793 statement by Thomas Jefferson for its conclusion that the. Second Amendment included the freedom to both purchase and sell arms: "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them.” Teixeira, 822 F.3d at 1055 (alteration in original) (quoting Thomas Jefferson, 3 Writings 558 (H.A. Washington ed,,' 1853)). But that was a factual statement—albeit an imprecise one, as we have shown—not a prescriptive one. Jefferson's observation does not support the conclusion that .the Founders understood the right to sell arms was to be independently protected by the Second Amendment. . Again, Teixeira has waived any right to amend his complaint in this litigation, see supra note 15, . See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 757 n.15, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means .... ”). Though Virginia State Board dealt with the right of listeners to hear particular speech, the Court identified it as “reciprocal” to the right of the speaker. Id. at 757, 96 S.Ct. 1817. It follows that the speaker’s right is undiminished by the availability of other people merchandising the same ideas and messages. . The same principle applies in the Sixth Amendment context. The Sixth Amendment provides a criminal defendant the right to an attorney in criminal proceedings, but does not confer upon any attorney a corresponding right to represent a defendant (much less to do so for a fee). See Faretta v. California, 422 U.S. 806, 819-20, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be ‘informed of the nature and cause of the accusation,' who must -be 'confronted with the witnesses against him,’ and who must be accorded 'compulsory process for obtaining witnesses in his favor,' ... The counsel provision supplements this design. It speaks of the 'assistance' of counsel,, and an assistant, however expert, is still an assistant. The language and spirit of .the Sixth Amendment contemplate that counsel, like the other defense, tools guaranteed by the Amendment, shall be an aid to a willing defendant ...."). Counsel do have their own right not to have their speech restricted when making legal arguments and giving clients advice, but that right derives from the First, not the Sixth, Amendment. See, e.g., Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 548, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). . Our conclusion is consistent with the Fourth Circuit’s determination in its unpublished decision in United States v. Chafin, 423 Fed.Appx. 342, 344 (4th Cir. 2011), that no historical authority "suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual’s right to sell a firearm” (emphasis in original). See also Mont. Shooting Sports Ass'n v. Holder, NO. CV-09-147-DWM-JCL, 2010 WL 3926029, at *21 (D, Mont. Aug. 31, 2010) ("Heller said nothing about extending Second Amendment protection to firearm manufacturers or dealers. If anything, Heller recognized' that firearms manufacturers and dealers are properly subject to regulation by the federal government under existing federal firearms laws.”).