IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of The Gun Range,    :
LLC                                  :    No. 90 C.D. 2021
                                          :    Argued: March 8, 2023
Appeal of: The Gun Range, LLC     :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE DUMAS                             FILED: February 27, 2024

The Gun Range, LLC (Gun Range) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court), entered January 6, 2021, which affirmed the decision and order of the Philadelphia Zoning Board of Adjustment (Board) and denied its application to operate a gun shop on its property. Gun Range asserts that the Philadelphia Zoning Code[1] violates its Second Amendment, U.S. Const. amend. II, right to operate a gun shop in the commercial districts of the City of Philadelphia (City). For the reasons stated below, we conclude that these zoning provisions, which regulate the commercial sale of arms, are not subject to the robust protection of the Second Amendment right to keep and bear arms. Therefore, we affirm in part the order of the trial court, albeit on different grounds. However, Gun Range further asserts that the Code is unconstitutional because it is *de facto* exclusionary. Upon review, it is apparent that the trial court

---

[1] Phila., Pa., Zoning Code, Title 14 (2015) (Code).

has yet to review this claim.  Accordingly, we vacate its order in part and remand with instructions for the trial court to address this claim in the first instance.

## I. BACKGROUND[2]

Gun Range operates a shooting range located in the City.  In 2015, the owner of Gun Range sought to open a gun shop on its premises and, to that end, filed an application with the Board of Licenses and Inspections (L&I).  L&I denied the application on two grounds.  First, the Code only permitted gun shops by right in I-3 zoning districts and by special exception in ICMX and I-2 districts,[3] but Gun Range is located in a CMX-2 commercial district.  Second, gun shops are a "regulated use" not permitted within 500 feet of a residential district, and Gun Range was located within 53 feet of a residential district on one side, and 85 feet on another.[4]

Gun Range appealed to the Board.  Initially, Gun Range sought a variance but later informed the Board that it would instead appeal solely on the ground that L&I had erred in denying its application.  *See* Appl. for Appeal, 4/23/15; Notes of Testimony (N.T.) Hr'g, 8/12/15, at 3-5.  The Board denied the appeal, and the trial court affirmed.  Gun Range then appealed to this Court.  Recognizing that the trial court had neglected to address the Second Amendment arguments raised by Gun Range, a panel of this Court remanded with instructions to address those arguments.  Rather than address those arguments substantively, the trial court

---

[2] The recitation of facts is derived from the Board's decision, which is supported by the record.  *See* Bd. Op., 10/6/15, at 1-5.  This matter has previously been before this Court; accordingly, we need not revisit the prior history of the case in detail.  *See Gun Range, LLC v. City of Phila.* (Pa. Cmwlth., No. 1529 C.D. 2016, filed May 7, 2018) (*Gun Range I*).  Additionally, Yuri Zalzman is the owner/principal of the subject property, and for ease of reference, we will refer collectively to Zalzman and Gun Range as "Gun Range."

[3] *See* Code § 14-602.

[4] *See* Code § 14-603(13).

concluded *sua sponte* and in summary fashion that Gun Range lacked standing to raise any Second Amendment claims. *See* Trial Ct. Order, 1/5/21, at 1-2.

Gun Range timely appealed again to this Court. During the pendency of this appeal, the United States Supreme Court issued its decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), which altered the analytical framework in which we may address Second Amendment claims. Following supplemental briefing from the parties to address *Bruen*, this matter is now ready for our consideration.

## II. ISSUES[5]

Gun Range asserts that the trial court erred in concluding that Gun Range lacked standing to challenge the Board's decision on Second Amendment grounds. *See* Appellant's Br. at 30-31. Second, Gun Range contends that the Code regulates conduct within the ambit of the Second Amendment and, therefore, runs afoul of the *Bruen* Court's decision. *See* Appellant's Suppl. Br. at 2-9. Finally, Gun Range contends that the Code is *de facto* exclusionary because gun shops are only permitted within industrial areas constituting three percent of the City, and not in any commercial district. *See* Appellant's Br. at 21-28.

---

[5] We discern the following issues set forth in Gun Range's original and supplemental briefs to this Court, arranged herein for ease of analysis.

## III. DISCUSSION[6]

### A. Standing

Initially, we consider the trial court's *sua sponte* determination that Gun Range lacked standing to challenge the Code on Second Amendment grounds. In our view, the trial court erred for two reasons. First, the trial court may not raise the issue of standing *sua sponte*, and second, Gun Range possessed derivative standing to bring these claims on behalf of its customers.

Generally, a party seeking redress from the courts must establish standing to bring and maintain an action. *Firearm Owners Against Crime v. City of Harrisburg*, 218 A.3d 497, 505 (Pa. Cmwlth. 2019), *aff'd sub nom. Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 567 (Pa. 2021). To establish standing, a person must show that they are adversely affected and aggrieved by the matter they seek to challenge. *See, e.g.*, *Fumo v. City of Phila.*, 972 A.2d 487, 496 (Pa. 2009) (recognizing that state legislators had standing to seek judicial review of a city license issuance to the extent that it had interfered with their legislative duties).

However, it is well settled that a court may not raise a party's standing *sua sponte*. *Commonwealth v. Koehler*, 229 A.3d 915, 940 (Pa. 2020) (rejecting standing concerns raised by the dissent as "not available for *sua sponte* consideration"); *Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 717 (Pa. 2009) (similarly rejecting concerns voiced in a concurring opinion as "within the umbrella of the standing doctrine" and "not available for consideration at this time, since they

---

[6] The parties presented no additional evidence to the trial court. Therefore, our review is limited to determining whether the Board committed an abuse of discretion or an error of law. *German v. Zoning Bd. of Adjustment*, 41 A.3d 947, 949 n.1 (Pa. Cmwlth. 2012). The Board abuses its discretion if its findings are not supported by substantial evidence. *Arter v. Phila. Zoning Bd. of Adjustment*, 916 A.2d 1222, 1226 n.9 (Pa. Cmwlth. 2007). "'Error of law' in this instance is used in its broad sense and includes questions of constitutionality." *Gaudenzia, Inc. v. Zoning Bd. of Adjustment of City of Phila.*, 287 A.2d 698, 701 (Pa. Cmwlth. 1972).

have not been raised by any of the parties"); *In re Nomination Pet. of DeYoung*, 903 A.2d 1164, 1168 (Pa. 2006). Indeed, if a court does raise the issue of standing *sua sponte*, it will constitute grounds for reversal. *See DeYoung*, 903 A.2d at 1168 n.6.

For example, in *DeYoung*, a qualified elector filed a petition objecting to the statement of financial interests attached to the nomination petition of a candidate for state-level office. *See id.* at 1166. This Court *sua sponte* dismissed the petition for lack of standing, opining that only the State Ethics Commission could challenge the adequacy of a candidate's statement. *See id.* In support of its *sua sponte* dismissal, this Court reasoned that the concept of standing was interwoven with subject matter jurisdiction and, thus, became a jurisdictional prerequisite to the action. *See id.* at 1166-67.

Upon review, the Pennsylvania Supreme Court soundly rejected this reasoning. "This [Supreme] Court has consistently held that a court is prohibited from raising the issue of standing *sua sponte*." *Id.* at 1168 (citing cases and clarifying that standing is not a jurisdictional question); *accord Bisher v. Lehigh Valley Health Network, Inc.*, 265 A.3d 383, 403 (Pa. 2021) ("Pennsylvania . . . does not view standing as a jurisdictional question.").

Instantly, the City has not challenged Gun Range's standing to bring a Second Amendment challenge. *See* Appellee's Br. to Trial Ct., 3/6/20. Rather, the City has rejected consistently the substantive merits of Gun Range's constitutional arguments. *See id.* at 6-15; *see also, e.g.*, Appellee's Br., 5/5/22, at 10-27; Appellee's Suppl. Br., 2/6/23, at 5-20.[7]

Nevertheless, the trial court *sua sponte* reasoned that Gun Range was not a proper party to raise a Second Amendment challenge. *See* Trial Ct. Order,

---

[7] Even following the trial court's standing analysis, the City did not assert a lack of standing on appeal. *See* Appellee's Br. at 16 n.4; Appellee's Suppl. Br. at 13 n.6.

1/5/21, at 1-2. According to the trial court, "[t]he Second Amendment rights raised in [Gun Range's] arguments, such as firearm proficiency and certification, are individual rights that are not held by a commercial shooting range and thus cannot be asserted by [Gun Range], as a commercial entity." *See id.* The trial court concluded that "[t]his is a matter of standing." *Id.* at 2.

Standing was not at issue before the Board or raised by any party before the trial court. Thus, as in *DeYoung*, the court erred by addressing *sua sponte* Gun Range's standing. 903 A.2d at 1167-68.

Moreover, contrary to the trial court's analysis, federal case law suggests that the operator of a gun store has derivative standing to assert the subsidiary right to acquire arms on behalf of potential customers. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 526 (1925); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (*en banc*); *Ezell v. City of Chicago*, 651 F.3d 684, 702-704 (7th Cir. 2011) (*Ezell I*).[8]

In *Pierce*, two private schools brought suit to enjoin the enforcement of an education act in Oregon, which essentially compelled children's attendance at public school. 268 U.S. at 529-31. One of the schools argued that the act

---

[8] We are bound by decisions of the Supreme Court of the United States. *NASDAQ OMX PHLX, Inc. v. PennMont Secs.*, 52 A.3d 296, 303 (Pa. Super. 2012) (*NASDAQ*). Although we are not bound by the decisions of federal district courts, federal circuit courts, or the courts of other states in applying federal substantive law, we may cite such decisions when they have persuasive value. *Desher v. Se. Pa. Transp. Auth.*, 212 A.3d 1179, 1186 (Pa. Cmwlth. 2019). Further, "[w]henever possible, Pennsylvania state courts follow the Third Circuit so that litigants do not improperly walk across the street to achieve a different result in federal court than would be obtained in state court." *NASDAQ*, 52 A.3d at 303 (cleaned up). We may cite to Superior Court or non-precedential federal cases for their persuasive value. *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 653 n.20 (Pa. Cmwlth. 2021); *Register v. Longwood Ambulance Co.*, 751 A.2d 694, 699 n.2 (Pa. Cmwlth. 2000); *Bienert v. Bienert*, 168 A.3d 248, 255 (Pa. Super. 2017).

contravened rights guaranteed it by the Fourteenth Amendment.[9] *See id.* at 533. The Supreme Court noted that the schools were corporations and generally could "not claim for themselves the liberty which the Fourteenth Amendment guarantees." *Id.* at 535. However, because the Act would cause "arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property," the schools had a "clear and immediate" interest to bring suit. *Id.* at 536. Thus, albeit in a different context, *Pierce* stands for the proposition that a private business may bring suit on behalf of its customers.

In *Teixeira*, a prospective gun store operator brought an action alleging that a county ordinance restricting the location of gun shops violated his Second Amendment rights, as well as those of his potential customers. *See Teixeira*, 873 F.3d at 673. In its decision, the Ninth Circuit recognized that Teixeira had "derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers." *Id.* at 678. According to the *Teixeira* Court, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)).[10]

Finally, in *Ezell I*, the plaintiffs, which included individual residents, a corporation, and two advocacy groups, challenged a Chicago ordinance that banned firing ranges within the city but mandated an hour of range training as a prerequisite to lawful gun ownership. *See Ezell I*, 651 F.3d at 689-92. The district court held

---

[9] Section 1 of the Fourteenth Amendment states, in relevant part: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

[10] In *Craig*, the Court permitted a beer vendor to challenge an alcohol regulation based on its patrons' equal protection rights. 429 U.S. at 195.

that while the individual plaintiffs had standing, "the organizations [did] not have the necessary standing to demonstrate their irreparable harm." *Id.* at 696. On appeal the Seventh Circuit rejected this holding, noting that the corporate plaintiff, a supplier of firing-range facilities, was harmed by the ban but additionally was permitted to "act as an advocate of the rights of third parties who seek access to its services." *See id.* (citing *Craig* and *Pierce*).[11]

We find these cases instructive and persuasive. Gun Range is a private business that may bring suit on behalf of its customers. Just as the private schools in *Pierce*, the prospective gun shop owner in *Teixeira*, and the corporate firing range in *Ezell I*, Gun Range has derivative standing to challenge the City's zoning ordinances on Second Amendment grounds. *Pierce*, 268 U.S. at 535-36; *Teixeira*, 873 F.3d at 678; *Ezell I*, 651 F.3d at 696.

## B. The Second Amendment[12]

### 1. Introduction

The Second Amendment provides that "[a] well[-]regulated Militia, being necessary to the security of a free State, the right of the people to keep and

___

[11] With regard to the advocacy groups, the Seventh Circuit further observed that both associations had members residing in Chicago and could meet requirements for "associated standing." *See Ezell I*, 651 F.3d at 696. Specifically, the *Ezell I* Court noted that: "(1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit." *Id.*

[12] Generally, there is a strong presumption in the law that legislative enactments are constitutional. *Caba v. Weaknecht*, 64 A.3d 39, 49 (Pa. Cmwlth. 2013). To prevail, a petitioner must show that the legislation "clearly, palpably, and plainly" violates the United States or Pennsylvania constitutions. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Cmwlth.*, 877 A.2d 383, 393 (Pa. 2005) (*Gambling Expansion Fund*). "All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster." *Caba*, 64 A.3d at 49. As

8

bear Arms, shall not be infringed." U.S. Const. amend. II. The precise meaning and scope of the rights encompassed by the Second Amendment has long been a subject of controversy, robust debate, and litigation. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 598-600 (2008) (discussing debate surrounding ratification of the Second Amendment). There can be little doubt that our public discourse shall continue. *See, e.g.*, *Barris v. Stroud Twp.*, 257 A.3d 209 (Pa. Cmwlth. 2021) (*Barris I*), *rev'd*, --- A.3d ----, 2024 WL 696822 (Pa. 2024) (*Barris II*);[13] *Drummond v. Robinson Twp.*, 9 F.4th 217, 222 (3d Cir. 2021) ("[W]hile the right to bear arms may no longer present a 'vast *terra incognita*,' uncharted frontiers remain.").[14, 15]

---

will be seen, however, in cases where regulated conduct is covered by the plain text of the Second Amendment, the government bears the burden of proof. *See Bruen*, 597 U.S. at 24.

There are two ways to challenge the constitutionality of a legislative enactment: either the enactment is unconstitutional on its face or as applied in a particular circumstance. *Johnson v. Allegheny Intermediate Unit*, 59 A.3d 10, 16 (Pa. Cmwlth. 2012) (*en banc*).

[13] In *Barris*, the Pennsylvania Supreme Court considered and approved an ordinance that limits target shooting to certain non-residential zoning districts under the standards announced in *Bruen*. *Barris II*, 2024 WL 696822 at *30.

[14] The Second Amendment applies to the states and local governments through the Due Process Clause of the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (plurality); *see also* U.S. Const. amend. XIV. Further, where the state constitution provides no broader protections than the federal constitution, it is "unnecessary to provide a separate analysis under each constitution." *See, e.g.*, *Paz v. Pa. Hous. Fin. Agency*, 722 A.2d 762, 765 (Pa. Cmwlth. 1999). Article I, section 21 of the Pennsylvania Constitution states: "The right of the citizens to bear arms in defence of themselves and the State shall not be questioned." Pa. Const. art. I, § 21. Both Constitutions "guarantee an individual a right to keep and bear arms, especially for purposes of self-defense, and this right exists outside the home." *Crawford v. Cmwlth.*, 277 A.3d 649, 674 (Pa. Cmwlth. 2022). Further, Gun Range presents no argument that Pennsylvania provides broader protection than the federal constitution. Therefore, we proceed with a single analysis.

[15] We find the quote from *Drummond* insightful. Nevertheless, we note that the *Drummond* Court issued its decision pre-*Bruen*. Moreover, we would be remiss if we did not further acknowledge that the *Drummond* Court applied the two-step framework adopted by the United States Court of Appeals for the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *abrogation recognized*, *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). *See Drummond*, 9 F.4th at 226-34. As mentioned, *infra*, the *Bruen* Court accepted the first step of the

9

In *Heller*, the United States Supreme Court considered a challenge to a District of Columbia law that effectively banned the possession of handguns inside the home. 554 U.S. at 573. The *Heller* Court examined the text of the Second Amendment, referenced analogues adopted in several states that codified an individual right to bear arms, and considered the historical understanding of the amendment in the century that followed its ratification. *See id.* at 576-626. Following this exhaustive review, the Court recognized that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."[16] 554 U.S. at 592. Therefore, the *Heller* Court concluded, a "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[17] *Id.* at 635.

Importantly for our current purposes, the *Heller* Court also recognized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court specifically identified four categorical exceptions to the broad scope of the amendment's protection, declaring that "nothing in our opinion should be taken to

---

two-step framework as largely consistent with *Heller*; therefore, cases like *Drummond* retain some value in our analysis. We will limit our reliance on *Drummond*, *Marzzarella*, and other pre-*Bruen* precedent to the extent those cases comport with *Bruen* and remain persuasive.

[16] Finding parallels with the First and Fourth Amendments, U.S. Const. amends. I, IV, the *Heller* Court reasoned that the text of the Second Amendment "implicitly recognizes the *pre-existence* of the right" that "shall not be infringed." *Id.* (emphasis added) (citing *United States v. Cruikshank*, 92 U.S. 542, 553 (1876) (opining that the right is not dependent upon the Constitution for its existence)).

[17] In reaching this conclusion, the *Heller* Court did not identify or apply any particular standard of scrutiny. *Id.* at 628-29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, . . . [the law] would fail constitutional muster."). However, the Court expressly rejected rational basis, reasoning that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.* at 628 n.27.

10

cast doubt on longstanding prohibitions on the possession of firearms by [1] felons and [2] the mentally ill, or [3] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or [4] laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. According to the *Heller* Court, such laws are "*presumptively lawful* regulatory measures." *Id.* at 627 n.26 (emphasis added).

Thereafter, the Court revisited the Second Amendment in *McDonald*. The *McDonald* Court examined the handgun bans and related ordinances of the City of Chicago and a nearby suburb, ultimately holding that the Second Amendment right to keep and bear arms is fully applicable to the States by virtue of the Fourteenth Amendment.[18] *See McDonald*, 561 U.S. at 791. Notably, a plurality of the Court reaffirmed the *Heller* Court's endorsement of the four categorical exceptions, assuring that such longstanding regulatory measures were not imperiled.[19] *Id.* at 786 ("Despite . . . doomsday proclamations, incorporation [of the Second Amendment] does not imperil every law regulating firearms.").

In the years following *Heller* and *McDonald*, the lower federal courts adopted a two-step framework in addressing the merits of a Second Amendment challenge. *See, e.g.*, *Teixeira*, 873 F.3d at 682-83; *Ezell I*, 651 F.3d at 701-04; *Marzzarella*, 614 F.3d at 89; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010). State courts, too, would come to address Second Amendment claims in this way. *See, e.g.*, *Barris I*, 257 A.3d at 219-20.

---

[18] This portion of Justice Alito's opinion was joined by Chief Justice Roberts and Justices Scalia, Kennedy, and Thomas. *See McDonald*, 561 U.S. at 748.

[19] This portion of Justice Alito's opinion was joined by Chief Justice Roberts and Justices Scalia and Kennedy. *See McDonald*, 561 U.S. at 748.

In the first step, the court would inquire "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89. This required "a textual and historical analysis of the amendment." *Teixeira*, 873 F.3d at 682. If the regulated conduct fell outside the scope of the Second Amendment, the judicial inquiry was complete. *See, e.g.*, *id.* at 690 (ending its analysis after concluding that "the Second Amendment does not independently protect a proprietor's right to sell firearms").

When a court determined that the regulated conduct fell within the scope of the Second Amendment right, it would proceed to a second step and "evaluate the law under some form of means-end scrutiny."[20] *Marzzarella*, 614 F.3d at 89. Drawing on First Amendment jurisprudence, "the rigor of the judicial review [would] depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell I*, 651 F.3d at 703. For example, the *Ezell I* Court found a city-wide prohibition on firing ranges was a "serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708 (thereafter applying something less than strict scrutiny before enjoining a city-wide ban on firing ranges).

---

[20] "Means-end scrutiny is an analytical process involving examination of the purposes (ends) which conduct is designed to serve and the methods (means) chosen to further those purposes." Russell W. Galloway, Jr., Means-End Scrutiny in American Constitutional Law, 21 Loy. L.A. L. Rev. 449, 449 (1988). When government conduct is subject to a constitutional limit, means-end scrutiny provides a "method for evaluating the sufficiency of the government's justification for its conduct." *Id.* The level of scrutiny will vary, based on the nature of the conduct and the protected interest in question, from deferential (*e.g.*, rational basis) to more intense (*e.g.*, intermediate and strict scrutiny). *See id.* at 450-57.

## 2. The *Bruen* Court's impact on Second Amendment analysis

Recently, the United States Supreme Court further clarified its analysis in *Heller* and *McDonald* to hold that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. At issue was a New York state licensing regime, which required an applicant to demonstrate "proper cause" by proving a "special need for self-protection." *See id.* at 12-13. The denial of an application was subject to limited and deferential judicial review, with courts upholding the denial, provided there was some rational basis to support it.[21] *See id.* at 13.

In reaching its decision, the *Bruen* Court rejected expressly the two-step framework adopted by the lower courts as "one step too many." *Id.* at 19. The Court observed that step one was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* However, the *Bruen* Court criticized efforts to balance competing interests or engage in an assessment of the costs and benefits of firearms restrictions. *See id.* According to the *Bruen* Court, neither *Heller* nor *McDonald* supported means-end scrutiny.[22] *Id.*

---

[21] The *Bruen* Court characterized the proper cause standard as demanding because living or working in a high-crime area was insufficient; rather, the state courts would "generally require evidence of particular threats, attacks, or other extraordinary danger to personal safety." *Bruen*, 597 U.S. at 12-13. The Court also distinguished New York's "may issue" regime from the majority of states that had adopted "shall issue" regimes, which limited the discretion of licensing officials to deny an application based on a perceived lack of need or suitability. *Id.* at 13-15.

[22] The *Bruen* Court reasoned that "the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Bruen*, 597 U.S. at 23 (emphasis removed). Further, in rejecting an interest-balancing inquiry, the Court "necessarily rejected intermediate scrutiny." *Id.* Expanding upon this point, the Court criticized courts' frequent "defer[ence] to the determinations of legislatures." *Id.* at 26. Rather, according to the Court, "[t]he Second Amendment is the very product of an interest balancing by the people," and "it is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.* (quoting *Heller*, 554 U.S. at 635).

The *Bruen* Court then summarized the appropriate constitutional standard:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 24. Thus, the Court hoped to provide a standard that "accords with how we protect other constitutional rights," such as those ensconced in the First and Sixth Amendments, U.S. Const. amend. VI.[23] *Id.* at 24-25.

Importantly, as the Court had previously professed in *Heller* and *McDonald*, the *Bruen* Court asserted that "individual self-defense is the central component of the Second Amendment right," *id.* at 29 (cleaned up), but also reiterated that "the right secured by the Second Amendment is not unlimited." *Id.* at 21 (quoting *Heller*, 554 U.S. at 626), 80-81 (Kavanaugh, J., concurring) (suggesting that the Second Amendment allows a variety of presumptively lawful regulatory measures, including "laws imposing conditions and qualifications on the commercial sale of arms").

---

[23] The *Bruen* Court offered further insight into a proper, historical inquiry. *See id.* at 26-31 (advising that analogical reasoning was an appropriate method to ascertain "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"). The depth of the Court's inquiry was substantial, including evidence originating in medieval England and stretching into the early-20th century. *See id.* at 34-70. However, the Court also cautioned that "when it comes to interpreting the Constitution, not all history is created equal" and stressed that "[h]istorical evidence that long predates either [the Second or Fourteenth Amendments] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 34. At the other end of the temporal spectrum, the Court cautioned, modern evidence "cannot provide much insight into the meaning of the Second Amendment . . . ." *Id.* at 66; *see generally Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134-36 (3d Cir. 2024).

To summarize, if the plain text of the Second Amendment covers an individual's conduct, then the government is restricted from regulating that conduct and is subject to the amendment's "unqualified command," *i.e.*, the individual's conduct is protected, absent historical evidence demonstrating a tradition of identical or analogous regulations. *Id.* at 24. In other words, government regulations that infringe upon an individual's right to armed self-defense are presumptively unconstitutional. *Id.* But this fundamental rule is tempered by the Court's consistent recognition that certain categories of regulations are rooted in this Nation's historical tradition. Such regulations, including "laws imposing conditions and qualifications on the commercial sale of arms," are "presumptively lawful regulatory measures . . . ." *Heller*, 554 U.S. at 626-27 & 627 n.26; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring).

### 3. The parties' arguments

With this background in mind, we turn to the parties' arguments concerning the impact of *Bruen* on the City's zoning regulations. Gun Range contends that the Code regulates conduct "within the ambit" of the Second Amendment. Appellant's Suppl. Br. at 4. It describes this regulated conduct as "selling, leasing, purchasing, or lending of guns, firearms, or ammunition."[24] *Id.* at 1. Drawing a comparison to the "purchase and practice" restrictions addressed by pre-*Bruen* federal courts in *Drummond* and *Ezell I*, Gun Range reasons that the City's regulation of the commercial sale of arms implicates the Second Amendment

---

[24] This is consistent with the Code's definition of a gun shop. *See* Code § 14-601-6 (defining a gun shop as "[a]ny retail sales business engaged in selling leasing, purchasing, or lending of guns, firearms, or ammunition"). For ease of analysis, we will refer to this conduct as the commercial sale of arms. Also, we acknowledge Gun Range's assertion that the City has waived any defense of the full enumerated list of regulated conduct except for selling. *See* Appellant's Suppl. Br. at 5-6. In our view, the City has adequately defended and briefed this issue; we discern no waiver.

because it deprives "would-be gun owners of the guns and skills commonly used for lawful purposes . . . ." *Id.* at 4 (quoting *Drummond*, 9 F.4th at 230).[25]

Therefore, according to Gun Range, the Second Amendment presumptively protects this conduct, and the City "must demonstrate that its regulation is consistent with our Nation's historical tradition of firearm regulation." *Id.* at 6 (quoting *Bruen*, 597 U.S. at 17). Gun Range notes that the City has failed to introduce any historical evidence in this matter. *See id.* at 8-9. Moreover, according to Gun Range, there is an absence of relevant, historical support because the Code was not established until 1933, and "gun shops" were not included in the Code until 2007. *See id.* at 9. Thus, Gun Range concludes that the City failed to meet its burden under *Bruen* and asks that this Court declare unconstitutional the gun-related provisions in the Code.[26, 27] *See id.*

---

[25] We acknowledge that the *Drummond* Court referenced purchase and practice restrictions collectively. *See Drummond*, 9 F.4th at 226, 230. However, at issue were two zoning restrictions specifically targeting gun ranges, not gun shops engaged in the commercial sale of arms. *See id.* at 224.

[26] There are two ways to challenge the constitutionality of a legislative enactment: either the enactment is unconstitutional on its face or as applied to a particular person under particular circumstances. *Johnson*, 59 A.3d at 16. Throughout this litigation, Gun Range has not specified whether it presents a facial or as-applied constitutional challenge to the Code. *See* Appellant's Mem. to Bd., 8/12/15, at 1, 6-9 (unpaginated); *see generally* N.T. Bd. Hr'g, 8/12/15; Appellant's Br. to Trial Ct., 4/11/16, at 17-20; Appellant's Br., 2/24/22, at 13-21, 32. However, Gun Range now asks that this Court declare the Code is "unconstitutional on its face and as applied." Appellant's Suppl. Br. at 9. This lack of clarity is concerning. Constitutional "challenges to a statute's application . . . must be raised before the [local] agency or are waived for appellate review." *Lehman v. Pa. State Police*, 839 A.2d 265, 275 (Pa. 2003). Ultimately, however, we reject the premise of Gun Range's Second Amendment claim. Therefore, we need not further parse its arguments to determine the appropriate scope of relief.

[27] Additionally, Gun Range asserts that a restriction on the locations in which a *gun shop* may operate infringes on a protected right of individuals to practice firearm proficiency at a *shooting range*. *See* Appellant's Suppl. Br. at 4. We reject this assertion summarily as we have previously determined that "[a] shooting range and a gun shop are different uses of property." *Gun Range I*, slip op. at 1.

16

In response, the City suggests that the *Bruen* Court left in place a threshold, textual inquiry into whether the Second Amendment encompasses an individual's conduct. *See* Appellee's Suppl. Br. at 5-6. If it does, the City concedes that the Second Amendment presumptively protects the conduct, and the government must justify its regulation with evidence demonstrating that the regulation is consistent with historical tradition. *Id.* at 6. If it does not, the City asserts that it bears no such burden. *See id.*[28]

Further, the City maintains that the *Bruen* Court did nothing to displace "longstanding or common firearm regulations." *Id.* at 8. In particular, the City directs our attention to the concurring opinion filed by Justice Kavanaugh in *Bruen*, which highlighted the four categorical exceptions to the broad right to bear arms defined by the Supreme Court in *Heller* and *McDonald*, including "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 8 (quoting *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring)). According to the City, such laws remain "presumptively lawful" and do not implicate the Second Amendment. *Id.* at 13.

---

[28] The City also reasons that the *Bruen* Court's use of "conditional phrasing" in describing the constitutional inquiry places the initial burden, *i.e.*, to establish that certain conduct is covered by the Second Amendment's plain text, with the claimant. Appellee's Suppl. Br. at 7. For example, the City notes that there is a presumption of constitutional protection "*when* the Second Amendment's plain text covers an individual's conduct. *Id.* (quoting *Bruen*, 597 U.S. at 17) (emphasis added by the City). Similarly, a respondent bears a burden to demonstrate historical consistency "*because* the Second Amendment's bare text covers petitioners' public carry[.]" *Id.* (quoting *Bruen*, 597 U.S. at 44 n.11) (emphasis added by the City). According to the City, "if the burden were on the government throughout, the [*Bruen*] Court would not have used this conditional phrasing in describing when it applies." *Id.* We will not address this argument in detail. It is plainly evident that a claimant bears some initial burden to define the claim, and this initial burden coincides with the principles that, generally, laws are presumed to be constitutional and a claimant must prove otherwise. *Caba*, 64 A.3d at 49; *Gambling Expansion Fund*, 877 A.2d at 393.

Proceeding within this framework, the City asserts that its regulation of the location of gun shops is constitutionally sound. *Id.* This is because, according to the City, "the claimed right in this case to sell guns at a particular location is far afield from the core individual right to possess and carry weapons." *Id.* at 9. Pointing to precedent from other jurisdictions, both pre- and post-*Bruen*, the City maintains that no court has ever recognized a Second Amendment right to sell firearms in a particular location. *See id.* at 10-12 (citing, *e.g.*, *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. filed Aug. 30, 2022); *Drummond*; and *Teixeira*).[29]

## 4. The Second Amendment does not protect the proposed course of conduct

We are largely in agreement with the City's arguments on this issue. *Bruen* instructs that we must first consider whether the plain text of the Second Amendment covers Gun Range's proposed course of conduct, *i.e.*, the commercial sale of arms. *See Bruen*, 597 U.S. at 24. We conclude that it does not. Further, we reject the assertion by Gun Range that the *Bruen* standard applies to all conduct that falls "within the ambit" of the Second Amendment and decline to extend *Bruen* to rights merely implied by the plain text.

The plain text of the Second Amendment provides that "the right of the people to keep and bear arms . . . shall not be infringed" and guarantees an individual right to possess arms for the purpose of self-defense. *See generally Bruen*; *McDonald*; *Heller*. This right necessarily encompasses and/or requires that a law-

---

[29] We acknowledge a further argument from the City, *i.e.*, Gun Range has not offered a meaningful analysis, consistent with *Bruen*, that focuses on Gun Range's derivative right to pursue a Second Amendment claim on behalf of its current or potential customers. We agree. Apart from drawing a passing comparison to "purchase and practice" restrictions that impact an individual's right to self-defense, Gun Range does not argue that the Code has interfered with citizens' sufficient access to firearms. *See* Appellant's Suppl. Br. at 1-9. Further, it has conceded that there are gun shops located throughout the City. *See* N.T. Bd. Hr'g, 8/12/15, at 13.

18

abiding individual or enterprise be permitted to acquire arms (and ammunition) and maintain proficiency in their use, else the right to self-defense would be meaningless, *i.e.*, "the core right wouldn't mean much without the training and practice that make it effective." *Ezell I*, 651 F.3d at 704; *Drummond*, 9 F.4th at 227. The right of acquisition implies a further right, that a law-abiding individual must be permitted to supply arms commercially.

However, in our view, while this series of inferences is perhaps logically sound, it lacks legal support. The *Bruen* Court focused its analysis on the plain text of the Second Amendment, and there is no obvious textual link between the right to keep and bear arms and a right to sell them. In other words, the plain text does not define an explicit, individual right to engage in the commercial sale of arms; there is no constitutional right to *provide* arms. Further, the *Bruen* Court cautioned that "the right secured by the Second Amendment is not unlimited," suggesting that even a logically inferred right may not warrant the robust constitutional protection defined in *Bruen*. *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626); *McDonald*, 561 U.S. at 786. Finally, and perhaps most importantly, the Court has consistently noted that certain categories of regulations, including "laws imposing conditions and qualifications on the commercial sale of arms," remain "presumptively lawful . . . ." *Heller*, 554 U.S. at 626-27 & 627 n.26; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring).

We are aware of no case in which the Supreme Court has addressed a Second Amendment challenge to laws regulating the commercial sale of arms. However, there exists persuasive guidance from the lower federal courts, both pre- and post-*Bruen*, that supports our conclusion that the Second Amendment does not protect Gun Range's proposed course of conduct.

In *Teixeira*, a case that preceded *Bruen*, the United States Court of Appeals for the Ninth Circuit considered a challenge to zoning laws that restricted where the plaintiffs could open a gun shop. *Teixeira*, 873 F.3d at 674. Following a textual and historical review, the Ninth Circuit concluded that the Second Amendment does not independently protect an individual's right to sell arms. *See id.* at 682-90;[30] *accord Drummond*, 9 F.4th at 230. The court also considered a derivative claim on behalf of the plaintiffs' customers but reasoned that "gun buyers have no right to a gun store in a particular location, at least as long as their access is not meaningfully constrained." *Teixeira*, 873 F.3d at 680. Upon reviewing the plaintiffs' allegations, the court discerned no plausible claim to relief. *Id.* at 680-81 (noting, *e.g.*, that the plaintiffs had not alleged that residents were prevented from acquiring firearms within the local jurisdiction).

Post-*Bruen*, several federal district courts have held similarly. For example, in *United States v. King*, 646 F. Supp. 3d 603 (E.D. Pa. 2023), a defendant challenged his criminal indictment for unlawfully engaging in firearms commerce. The defendant asserted that his alleged conduct, *i.e.*, buying and selling firearms, was "protected by the Second Amendment because it is an inescapable pre-condition of keeping and bearing arms . . . making the implicit right to buy and sell firearms a necessary complement protected by the plain text of the Second Amendment." *Id.* at 607 (cleaned up). The district court rejected this argument, asserting "it [would] not consider 'implicit' rights that may be lurking beneath the surface of the plain

---

[30] The *Teixeira* Court declined to rely solely on the exclusionary language in *Heller* and so conducted an independent textual and historical analysis. For example, according to the *Teixeira* Court, "the colonial governments substantially controlled the firearms trade." *Teixeira*, 873 F.3d at 685 (citing Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49th Parallel, vol. 34, at 6-8, 18-19 (2014)). The court also cited evidence that at least two colonies restricted *where* settlers could sell arms. *See id.* (citing evidence from Connecticut and Virginia).

20

text." *Id.* Further, the court reasoned, even if there were an implicit right, the *Heller* Court confirmed that "the government may regulate the commercial sale of firearms." *Id.* (citing *Heller*, 554 U.S. at 626-27).[31]

Based on this precedent, we conclude that the plain text of the Second Amendment does not presumptively protect Gun Range's proposed course of conduct. *Cf. Bruen*, 597 U.S. at 33 (concluding that the amendment's plain text "presumptively guarantees" the right to bear arms publicly for self-defense). Thus, an inquiry into the historical tradition of this Nation's zoning laws is unnecessary. *Cf. id.* at 34-70 (examining history of public carry laws). Further, we decline to extend *Bruen* to an implied right to engage in the commercial sale of arms because it is too attenuated from the right of law-abiding individuals to keep and bear arms for self-defense. *See generally Teixeira*; *King*; *Flores*. Finally, even if an implied right exists, *Heller*, *McDonald*, and *Bruen* have instructed that laws regulating the commercial sale of arms are presumptively lawful. For these reasons, we conclude that the gun-related provisions of the Code do not violate the Second Amendment.

---

[31] *See also, e.g.*, *United States v. Flores*, 652 F. Supp. 3d 796, 802 (S.D. Tex. 2023) (concluding that regulations on commercial sellers were presumptively lawful and rejecting an implication "by logical necessity a right to commercially deal in firearms"); *United States v. McNulty*, No. CR 22-10037-WGY, 2023 WL 4826950, at *4-6 (D. Mass. July 27, 2023) (holding that the commercial sale of firearms falls outside the Second Amendment and, therefore, *Bruen*'s historical tradition analysis was unnecessary); *Oakland Tactical Supply, LLC v. Howell Twp.*, No. 18-CV-13443, 2023 WL 2074298, at *4 (E.D. Mich. Feb. 17, 2023) (holding that the plain text of the Second Amendment does not cover the construction and use of an outdoor, open-air shooting range, and therefore declining to engage in the second part of the *Bruen* analysis); *Tilotta*, 2022 WL 3924282, at *6 (declining to require the government to justify its regulation of the commercial sale of arms with historical evidence because the right to keep and bear arms does not include the right to sell or transfer firearms without restriction).

## C. *De Facto* Exclusion

## 1. The parties' arguments

Gun Range contends that the Code is unconstitutional because it is *de facto* exclusionary.[32] Appellant's Br. at 21. According to Gun Range, the Code impermissibly restricts the geographic area in which the commercial sale of arms may occur.[33] *See id.* at 22.

Gun Range suggests the consideration of several factors in evaluating the Code's gun-related zoning restrictions, including (1) the size of the area allocated to the use, (2) whether the municipality is a logical place for the development to take place, (3) the history of zoning in the municipality, and (4) the presence or absence of an exclusionary intent. *Id.* (citing Ryan on Pa. Zoning, § 3.5.3).[34] Then, in rather conclusory fashion, Gun Range asserts the following: the City is the largest city in the Commonwealth; it is a logical place for the development of gun shops; the City has regulated zoning since 1933; and the "drastically" small area available for gun shops "clearly exhibits an exclusionary intent . . . ." *Id.* at 23.[35]

---

[32] "Zoning ordinances that exclude uses fall into one of two categories—*de jure* or *de facto*. In a *de jure* exclusion case, the challenger alleges that an ordinance on its face totally excludes a use. In a *de facto* exclusion case, the challenger alleges that an ordinance appears to permit a use, but under such conditions that the use cannot in fact be accomplished." *Twp. of Exeter v. Zoning Hr'g Bd. of Exeter Twp.*, 962 A.2d 653, 659 (Pa. 2009) (cleaned up).

[33] Gun Range asserts that the sale of firearms is permitted in "a mere three percent (3%)" of the City. Appellant's Br. at 22. It is unclear whether the Board credited this assertion. *See* Bd. Op., 10/6/15, at 1-5.

[34] Robert S. Ryan, *Pennsylvania Zoning Law & Practice* (2023).

[35] Thereafter, Gun Range references several cases in which parties challenged local zoning laws on the basis that those laws violated the Second Amendment. *See* Appellant's Br. at 23-28 (citing, *e.g.*, the *Ezell* line of cases, *Teixeira*, and *Barris I*). It remains unclear whether these cases are helpful in the context of a *de facto* exclusionary claim, which falls within "the broader confines of a substantive due process analysis pursuant to the Fifth and Fourteenth Amendments to the United States Constitution[, U.S. Const. amends. V, XIV,] and in keeping with [a]rticle [I], [s]ection 1 of the Pennsylvania Constitution." *KS Dev. Co., L.P. v. Lower Nazareth Twp.*, 149 A.3d 105, 110 n.4 (Pa. Cmwlth. 2016).

In response, the City first contends that this issue is not properly before the Court as it is beyond the scope of this Court's remand, which directed the trial court to consider Gun Range's Second Amendment arguments. *See* Appellee's Br. at 27 (quoting *Gun Range I*, slip op. at 26-27). Alternatively, the City invokes the "fair share" test, asserting that Gun Range has failed to prove that the firearms needs of the community's residents are not being adequately served. *See id.* at 28 (citing *Macioce v. Zoning Hr'g Bd. of Borough of Baldwin*, 850 A.2d 882 (Pa. Cmwlth. 2004)).[36]

## 2. The trial court did not address this issue

We reject the City's contention that we may not address this issue because it is beyond the scope of our prior remand. When this matter was previously before the Court, we identified four issues: (1) whether the Board capriciously disregarded evidence; (2) whether the Code is preempted by state law; (3) whether the Code is unconstitutional because it violates the Second Amendment, as well as article I, section 21 of the Pennsylvania Constitution; and (4) whether the Code is unconstitutional because it is *de facto* exclusionary. *Gun Range I*, slip op. at 8-9.

The Court disposed of the first and second issues. *See id.* at 9-13. Upon reaching the third issue and reviewing the relevant arguments, the Court observed that "[t]he trial court simply failed to address the constitutional issues raised by [Gun

---

[36] The "fair share" test was developed to analyze zoning ordinances that "effect a partial ban that amounts to a *de facto* exclusion of a particular use." *Macioce*, 850 A.2d at 889 (quoting *Fernley v. Bd. of Supervisors of Schuylkill Twp.*, 502 A.2d 585, 587-88 (Pa. 1985)); *see also Surrick v. Zoning Hr'g Bd. of Upper Providence Twp.*, 382 A.2d 105 (Pa. 1977). The most relevant inquiry is "whether the provision for a particular use in the ordinance at issue reasonably accommodates the immediate and projected demand for that use . . . ." *Macioce*, 850 A.2d at 889 (quoting *Fernley*, 502 A.2d at 588).

Range]." *Id.* at 14. We therefore ceased our appellate review and remanded to the trial court with instructions that it conduct an analysis.[37] *See id.* at 15-17.

Following remand, the trial court addressed the Second Amendment claims of Gun Range, and we have reviewed those claims on appeal. However, it is now clear that the trial court also neglected to address whether the Code is unconstitutional because it is *de facto* exclusionary. *See* Trial Ct. Order, 1/6/21; Trial Ct. Op., 12/2/16. Gun Range preserved this claim before the Board and is entitled to a review of its merits by the trial court.[38] *See* Appellant's Mem. to Bd. at 9-12 (unpaginated); *see also* Appellant's Br. to Trial Ct., 4/11/16, at 20-23. Accordingly, we are constrained to remand again with instructions that the trial court address whether the Code is *de facto* exclusionary. *See Zoning Bd. of Adjustment of the City of Phila. v. Woods Assoc.*, 534 A.2d 862, 866 (Pa. Cmwlth. 1987) ("[S]ince the question of the constitutionality of the [Code] . . . was properly submitted to the [Board], we now remand this matter to the trial court for a determination on the constitutional issue."); *London v. Zoning Bd. of Adjustment* (Pa. Cmwlth., No. 2256 C.D. 2014, filed July 7, 2016), slip op. at 9-10 ("[T]he trial court's order denying [a]pplicant's appeal is vacated[,] and the matter is remanded to the trial court for consideration of the constitutional issues.").

---

[37] The Court specifically directed the trial court "to address the constitutional issues raised by [Gun Range] under the Second Amendment of the United States Constitution, as well as under article I, section 21 of the Pennsylvania Constitution." *Gun Range I*, slip op. at 16-17.

[38] As noted in *Gun Range I*, the Board declined to address preemption or the constitutional issues because it determined that it lacked authority to do so. *See* Bd. Op. at 7; *see also* Section 8 of the First Class City Code, Act of May 6, 1929, P.L. 1551, *as amended*, 53 P.S. § 14759.

24

# IV. CONCLUSION

In this case, Gun Range has challenged gun-related provisions of the Code on constitutional grounds. Following a remand to the trial court for further analysis, we have reviewed the Second Amendment claims asserted by Gun Range and conclude as follows. First, the trial court erred in raising Gun Range's standing *sua sponte* and, further, Gun Range has derivative standing to bring Second Amendment claims on behalf of its customers. Second, the plain text of the Second Amendment does not define an explicit, individual right to engage in the commercial sale of arms. Thus, the *Bruen* standard is inapplicable.

Gun Range has also asserted that the Code is unconstitutional because it is *de facto* exclusionary. Upon review, the trial court has not addressed this claim. Accordingly, we remand to the trial court for further analysis consistent with this opinion.[39]

LORI A. DUMAS, Judge

---

[39] The trial court shall decide this issue on the record before it and shall not take any additional evidence.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of The Gun Range,     :
LLC                               :    No. 90 C.D. 2021
                                       :
Appeal of: The Gun Range, LLC     :

# **O R D E R**

AND NOW, this 27th day of February, 2024, the order entered by the Philadelphia County Court of Common Pleas (trial court), on January 6, 2021, is AFFIRMED in part and VACATED in part, and this matter is REMANDED for the trial court to address the claim advanced by The Gun Range, LLC, that the Philadelphia, Pennsylvania, Zoning Code, Title 14 (2015), is unconstitutional because it is *de facto* exclusionary.

Jurisdiction relinquished.

_____
LORI A. DUMAS, Judge